UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONIA J SLEIGHT,

                  Plaintiff,                         Civil Action No. 11-cv-13109

        v.                                           District Judge Avern Cohn
                                                     Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]**

        Plaintiff Tonia J Sleight brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties filed summary judgment motions (Dkts. 12, 15; *see also* Dkt. 16), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

**I.  RECOMMENDATION**

        For the reasons set forth below, this Court finds that the Administrative Law Judge did not sufficiently evidence that he considered Plaintiff's morbid obesity and failed to adequately address Plaintiff's sleep apnea.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment, which seeks a remand pursuant to sentence four of 42 U.S.C. § 405(g), be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

On January 25, 2007, Plaintiff filed an application for DIB, then, on May 30, 2007, she filed an application for SSI. (Tr. 12.) In both applications Plaintiff asserts that she became unable to work on December 29, 2006. (*Id.*) The Commissioner initially denied Plaintiff's disability applications on November 21, 2007. (*Id.*) Plaintiff then filed a request for a hearing, and on April 26, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") Andrew G. Sloss, who considered the case *de novo*. (Tr. 12-20, 27-47.) In a May 19, 2010 decision, ALJ Sloss found that Plaintiff was not disabled. (Tr. 12-20.) The ALJ's decision became the final decision of the Commissioner on June 10, 2011 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on July 19, 2011. (Dkt. 1.)

### B. Background

At the time of the ALJ's decision, Plaintiff was 34 years old. (*See* Tr. 29.) Plaintiff has a high school education. (Tr. 29.) She has previous work experience as an aide in an adult foster-care home. (Tr. 34.)

#### 1. *Plaintiff's Testimony at the Hearing Before the ALJ*

At her hearing before the ALJ, Plaintiff testified to several impairments: obesity, sleep apnea, asthma, a herniated disc, diabetes, edema in her legs, migraine headaches, bipolar disorder, and depression. (Tr. 30.)

Plaintiff attested that her obesity prevents her from "doing quite a bit."[1] (Tr. 30.) In

---

[1]The transcript literally reads: "I'm also obese, and it enables me from doing quite a bit." (Tr. 30.)

2

responding to questioning from her counsel, she informed the ALJ that she was 5' 6" tall but weighed 484 pounds.  (Tr. 34.)  She said that she had weighed above or around 450 pounds "for about the last four years."  (*Id.*)

Regarding her sleep apnea, Plaintiff stated that she sleeps with a CPAP machine and oxygen. (Tr. 30.)  She also averred, "I can be sitting and I fall right to sleep.  If I don't have my machine on at night I stop breathing. . . .  [W]hen they tested me it was 72 times."  (Tr. 31.)  Plaintiff also testified that she does not drive or go anywhere alone "because I'm afraid of falling asleep."  (Tr. 39.)  She attributed the need to take "a lot" of naps during the day to her sleep apnea.  (Tr. 33.)

Plaintiff said she had asthma since about age 14 or 15.  (Tr. 31.)  Her asthma symptoms include wheezing and shortness of breath.  (Tr. 31.)  Due to her asthma, she can only walk "a little ways" before she has "to sit right down."  (*Id.*)  For treatment, Plaintiff told the ALJ she used "two different inhalers plus oxygen."  (Tr. 32.)  Plaintiff said that Dr. Ashok Sonnad prescribed her oxygen and that her "flow rate" was at two-and-a-half.  (Tr. 32.)

Plaintiff also testified to a pinched nerve in her neck and a herniated disc in back. (Tr. 30, 32.)  Plaintiff said that, due to these impairments, she cannot stand for more than five minutes without sitting down and, similarly, she "can [only] sit for so long and then [has] to get up." (Tr. 33.)

Plaintiff stated that her migraine headaches cause her to be sensitive to light and noises. (Tr. 35.)  Plaintiff said that she avoids noises and goes to a dark room when she has migraines and that she has stayed there "for up to two days."  (Tr. 35.)

Plaintiff testified that she had been diagnosed with depression or bipolar disorder.  (Tr. 35-36.)  She stated that she has crying episodes two or three times per week.  (Tr. 36.)  She also testified

that she can "be in a good mood one minute and fly off the handle the next minute." (Tr. 40.) Although it is unclear whether the cause is her depression or bipolar disorder, Plaintiff also stated that she has problems concentrating. (Tr. 40.)

Plaintiff also offered testimony about her functional abilities and daily activities. She said that she lives with her aunt who does most of the cooking. (Tr. 33.) Plaintiff stated that she was able to cook "little things," however, and do a "little bit" of housework. (*Id.*) She said she uses a motorized scooter to go shopping. (*Id.*) During the day, Plaintiff watches TV and takes lots of naps. (*Id.*) Plaintiff said that the most weight she can lift is five pounds. (*Id.*)

### 2. Medical Evidence

As Plaintiff's testimony suggests, the administrative record evidences treatment for a number of ailments during the disability period. An October 2009 hospital discharge summary indicates a history of chest pain, right lower-extremity pain, a history of deep vein thrombosis, hematuria, type-II diabetes, obstructive sleep apnea, bipolar, anxiety, and depression, smoking, and hypertension. (Tr. 694-96.) A November 2009 record for a different hospital similarly summarized Plaintiff's treatment history,

> The patient is a 33-year-old morbidly obese Caucasian female with a past medical history of asthma, diabetes mellitus, 2 episodes of lower extremity [deep vein thromboses], bilateral lower extremity cellulitis, sleep apnea, migraines,[2] bipolar disorder, depression, anxiety and degenerative disc disease [who] presented to the ER with a chief complaint of shortness of breath since 1 week.

(Tr. 744.) For purposes of this Report and Recommendation, the medical records regarding

---

[2]Plaintiff went to the hospital or emergency room from migraines on numerous occasions in 2006. (*See* Tr. 362 (January 15, 2006); Tr. 441 (March 21, 2006); Tr. 355 (April 8, 2006); Tr. 349 (April 11, 2006); Tr. 433 (April 18, 2006); Tr. 287, 425 (July 12, 2006); Tr. 281 (August 7, 2006); Tr. 274 (September 9, 2006); Tr. 273, 395 (December 28, 2006); Tr. 262 (December 31, 2006).)

4

Plaintiff's obesity and sleep apnea are most relevant.

Around the time of the December 2006 disability onset date, Plaintiff was considered "morbid[ly] obes[e]" (Tr. 262) and her weight increased over the disability period. An emergency room note from March 2007 provided that Plaintiff was 5' 5" tall and weighed 338 pounds. (Tr. 258.) In the fall of 2007, Plaintiff had a similar weight. (Tr. 461, 591.) By August 2008, however, Plaintiff weighed 452 pounds. (Tr. 508.) It appears that in early-to-mid 2009 Plaintiff began the process to undergo gastric bypass surgery but a move derailed the process. (*See* Tr. 729 (hospital record noting that Plaintiff had "recently moved to the area"); Tr. 751 (discussing bypass prior to move).) On October 3, 2009, Plaintiff had a medical consult to rule out the possibility of thromboembolic disease. (Tr. 721.) The consulting physician noted, "This lady is 33 years old. She is morbidly obese. Her weight is approximately 500 pounds. She cannot really undergo studies of her chest, such as a CTA or VO scan because the equipment at [this facility] cannot handle her." (Tr. 721, 722; *see also* Tr. 729 ("[The patient] is a very heavy morbidly obese lady [at] about 490.").) As noted, at her administrative hearing in April 2010, Plaintiff told the ALJ she weighed 484 pounds. (Tr. 34.)

As explained in Social Security Ruling 02-1p, the National Institutes of Health classifies obesity into three levels based on the individual's body mass index:

> The National Institutes of Health (NIH) established medical criteria for the diagnosis of obesity in its Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998). These guidelines classify overweight and obesity in adults according to Body Mass Index (BMI). . . .
>
> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk

> for developing obesity-related impairments, includes BMIs greater
> than or equal to 40. These levels describe the extent of obesity, but
> they do not correlate with any specific degree of functional loss.

S.S.R. 02-1p, 2002 WL 34686281, at *2.  Using a height of 5' 6", Plaintiff's BMI was around 54 at

disability onset – well above the "extreme" obesity threshold.  (*See* Tr. 258.)  By the time of the

administrative hearing, Plaintiff's BMI was approximately 78 – nearly double the extreme threshold.

(*See* Tr. 34, 721.)

On November 14, 2007, Plaintiff underwent a sleep study conducted by Dr. Elie M. Obeid.

(Tr. 648-49.)  She had been "complaining of restless sleep, loud snoring, morning drowsiness and

headache, excessive daytime sleepiness and fatigue."  (Tr. 648.)  Plaintiff slept for 350 out of 411

minutes but persistent sleep was not achieved.  (*Id.*)  She had 100 apneas and hypopneas during the

study with her longest apnea lasting 13 seconds and longest hypopnea lasting 41 seconds.  (*Id.*)[3]  Dr.

Obeid noted that the "frequency of [the obstructive and central respiratory events] was 17 [per hour]

which is way above the cut of criteria for diagnosis of obstructive or central sleep apnea syndrome."

(Tr. 449.)[4]  He diagnosed Plaintiff with obstructive sleep apnea syndrome.  (*Id.*)[5]  Dr. Obeid also

---

[3]A hypopnea is an episode of airflow reduction whereas an apnea is an episode of airflow cessation.  *See* Eric J. Olson, M.D., *et al.*, Obstructive Sleep Apnea-Hypopnea Syndrome, 78 *Mayo Clinic Proceedings* 1545 (hereinafter "Olson"), 1545 (2003).

[4]Olson at 1548 ("The principal factor for the clinician to note is the apnea-hypopnea index (AHI), defined as the number of apneas and hypopneas per hour of sleep. . . .  An AASM expert panel has recommended that, at least for purposes of standardizing research methodology, mild OSAHS be defined by an AHI of 5 to 14, moderate by an AHI of 15 to 30, and severe by an AHI greater than 30.").

[5]According to an article appearing in the *Mayo Clinic Proceedings* journal,
> Obstructive sleep apnea-hypopnea syndrome (OSAHS) is
> characterized by repetitive episodes of airflow reduction due to
> pharyngeal narrowing, leading to acute gas exchange abnormalities
> and sleep fragmentation and resulting in neurobehavioral and
> cardiovascular consequences. . . . .

remarked, "Mrs. Sleight should be educated regarding the impact of morbid obesity on obstructive sleep apnea syndrome and she should be encouraged to accommodate regular exercise and diet program for weight loss." (Tr. 649.)

On April 21, 2008, Plaintiff returned to Dr. Obeid for a second sleep study. (Tr. 646.) The purpose of the study was to document the effectiveness of the continuous positive airway pressure ("CPAP") device[6] that Plaintiff used during sleep. Dr. Obeid found:

> CPAP at a pressure of 10cm of water seems to be well tolerated and decreases the frequency of the patient's respiratory events. Overall there was decrease in the frequency of the patient's respiratory events from an average of 17 events per hour of sleep observed during the baseline recording to 4 per hour of sleep during the present recording. Despite using higher CPAP pressure, [the patient] continues to have a number of hypopneas. At a pressure of 10cm of water she slept only for eight minutes. During this period of time she had one respiratory event. There was no oxygen desaturation below 90%. Mild snoring was observed at this level of pressure.

(Tr. 647.) Dr. Obeid concluded that Plaintiff "should use the CPAP at a pressure of 10cm of water for a few to several weeks and then she should be referred back to our sleep laboratory for new CPAP titration." (*Id.*)

---

> Excessive daytime sleepiness, impaired vigilance, mood disturbances, and cognitive dysfunction are features of OSAHS. Accordingly, pretreatment personal and public health ramifications include increased risk for motor vehicle crashes, occupational injuries, and decreased quality of life. Performance deficits during neuropsychological testing can be documented with even mild OSAHS. With a frequency of 15 apneas-hypopneas per hour of sleep, the decrement is equivalent to that associated with 5 years of aging. Vulnerability to sleepiness resulting from OSAHS varies considerably among patients.

Olson at 1545.

[6]A "device that pneumatically splints the upper airway during inspiration and expiration." *See* Olson at 1549.

7

On April 27, 2008 Plaintiff had a followup regarding neck pain with her primary care physician, Dr. Ashok Sonnad.  Dr. Sonnad noted that Plaintiff had recently been discontinued from pain medications because she had reported becoming drowsy and unresponsive.  (Tr. 681.)  Dr. Sonnad further provided: "because of concern[s] of narcolepsy and possibly sleep apnea problems[,] [we had a] discussion about not continuing opioids and benzodiazepines because of the side effects of her sleeping problems."  (Tr. 681.)

### 3. Vocational Expert's Testimony at the Hearing Before the ALJ

A vocational expert ("VE") also testified at Plaintiff's hearing.  The ALJ first asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past relevant work experience

> who is able to perform light work . . . except that she can never climb ladders, ropes or scaffolds and can only occasionally climb ramps or stairs[;]  .  .  .  can occasionally balance, stoop, crouch kneel or crawl[;] . . . must avoid concentrated exposure to excessive noise and vibration and must avoid even a moderate exposure to hazards[;] . . . is able to follow basic one and two step instructions[;]  .  .  .  can interact appropriately with others and adapt as needed, and . . . retains the capacity to do simple work tasks on a sustained basis.

(Tr. 42-43.)  The VE testified that the hypothetical individual could perform "light, unskilled" work as an information clerk, visual inspector, and sorter.  (Tr. 43.)

The ALJ then asked the VE if there were "any sedentary, unskilled jobs that would fall within the postural, environmental and nonexertional limitations that I outlined for the previous hypothetical?"  (Tr. 43.)  The VE testified that the individual could do "sedentary, unskilled" work as a video surveillance monitor (with 2,000 jobs in Michigan's lower peninsula), information clerk (1,200 jobs), and inspector (5,000).  (*Id.*)

When the ALJ added a sit-stand option at half-hour intervals, the VE replied, "the jobs I've listed allow that postural change."  (Tr. 43.)

**C. Framework for Disability Determinations**

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since December 29, 2006 – her alleged onset date.  (Tr. 14.)  At step two, the ALJ found that Plaintiff had the following severe impairments: low back pain, migraine headaches, and bipolar disorder.  (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 16-17.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant requires a sit/stand option at half hour intervals.  She can never climb ladders, ropes or scaffolds, and can occasionally climb ramps or stairs.  She can occasionally balance, stoop, crouch, kneel or crawl.  She must avoid concentrated exposure to excessive noise and vibration, and must avoid even moderate exposure to hazards.  She is able to follow basic one and two step instructions, can interact appropriately with others and adapt as needed.  She retains the capacity to do simple work tasks on a sustained basis.

(Tr. 17.)  At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 19.)  At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: video monitor, information clerk, and inspector.  (Tr. 19-20.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this

11

Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F.  Analysis

Although Plaintiff raises four claims of error on appeal, it is sufficient to focus on one.  In particular, Plaintiff asserts that, in view of S.S.R. 02-1p, for the ALJ "to not take [her] morbid obesity into account is simply untenable.  Such extreme obesity almost by definition impacts a person's functional capability as well as psychological status."  (Dkt. 16, Pl.'s Reply to Def.'s Mot. Summ. J. at 10; *see also* Dkt. 12, Pl.'s Mot. Summ. J. at 14.)  The Court has serious doubts about whether the ALJ complied with S.S.R. 02-1p in this case, and, in light of a related factual error, finds that remand for further explanation or fact finding is necessary.

In August 1999, the Social Security Administration removed Listing 9.09 for obesity from the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App'x 1.  *See* S.S.R. 02-1p, 2002 WL 34686281, at *1.  However, the Administration

> added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems. [*See* Listings 1.00Q, 3.00I, and 4.00F]. The paragraphs state that we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other

12

> impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

S.S.R. 02-1p, 2002 WL 34686281, at *1.

The Sixth Circuit has explained that "'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)). The Ruling details how a claimant's obesity will be considered at the various stages. At step two, an ALJ is to "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." 2002 WL 34686281, at *4. Regarding step three, the Ruling states: "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing" and "[w]e may also find that obesity, by itself, is medically equivalent to a listed impairment." 2002 WL 34686281, at *5. Regarding a claimant's residual functional capacity, the Ruling provides: "As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." 2002 WL 34686281, at *7. The Ruling cautions, however,

> we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

13

2002 WL 34686281 at *6.[7]

In this case, the Commissioner asserts that "The ALJ sufficiently considered Plaintiff's obesity when he evaluated Dr. Caputo's consultative examination report, the records of Dr. Sonad, and Plaintiff's hospital records, all of which mentioned her obesity." (Def.'s Mot. Summ J. at 19.) In relevant part, the ALJ recited the contents of Dr. Caputo's evaluation as follows:

> Janette S. Caputo, Ph.D., Psy.D., evaluated the claimant on November 5, 2007. The claimant reported that she suffered from migraine headaches and a back problem. She related that her back problem was a herniated disk in her lower back, attributed to a work injury in the mid 1990s. She had been told it might also have to do with being overweight. *She was grossly obese, with most of her weight in her torso and abdomen.* She claimed that she has had migraine headaches for 2-2.5 years. . . . [The claimant] was grumpy without apparent awareness of her sharp tone. She sat with no overt signs of physical discomfort. *On inquiry, she was 5' 6" tall and weighed 324 pounds.* She presented as genuinely convinced that she had bipolar disorder and that it was the sole cause of her anger. She exaggerated the suddenness and unpredictability of her anger. . . .

(Tr. 15 (emphases added).)   Similarly, in summarizing a hospital discharge report, the ALJ wrote:

> In November 2007, she was treated and released with a discharge diagnosis of asthma with bronchitis; back pain with lumbosacral spine disc herniation with spasm of the back; bipolar disorder; gastroesophageal reflux disease; and *morbid obesity.* All the claimant's blood profiles were normal as well has [*sic*] heart profile. X-rays of the chest did not show any pneumonia. She started improving after breathing treatments. Persistent coughing caused her to have chest and back pain.

(Tr. 16 (emphasis added).)   While these near verbatim summaries indicate that the ALJ was *cognizant* of Plaintiff's obesity, they do not show that the ALJ "*consider[ed]* the claimant's obesity,

---

[7]This statement appears in the context of a discussion of how the step-three analysis may be affected by a claimant's obesity; the general nature of the language, however, suggests that it applies to the entirety of the Ruling.

in combination with other impairments, at all stages of the sequential evaluation." *Nejat*, 359 F. App'x at 577; *cf. Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010) (finding no violation of S.S.R. 02-1p where the ALJ used physician opinions that accounted for the claimant's obesity in fashioning the claimant's RFC, thereby incorporating "the effect that obesity has on the claimant's ability to work into the RFC he constructed"). And the ALJ did not, as the plain language of S.S.R. 02-1p demands, "explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." S.S.R. 02-1p, 2002 WL 34686281, at *7; *see also Norman v. Astrue*, 694 F. Supp. 2d 738, 741-42 (N.D. Ohio 2010) ("Put simply, [S.S.R. 02-1p] is more than a requirement that the ALJ mention the fact of obesity in passing: 'courts . . . remand[] even for a mere failure to consider obesity.'" (quoting *Macaulay v. Astrue*, 262 F.R.D. 381, 390 (D.Vt. 2009); citing *Johnson v. Astrue*, No. 08-3658, 2010 WL 148411, at *18 (S.D. Tex. Jan. 11, 2010); *Priestley v. Astrue*, No. 6:08-546, 2009 WL 1457152, at *14 (D.S.C. May 22, 2009))).

The Commissioner's second argument is stronger. The Commissioner asserts, "In her brief, Plaintiff has not identified any obesity-related limitations that the ALJ failed to include in the RFC assessment," nor cited to "medical evidence that would support additional functional restrictions related to obesity." (Def.'s Mot. Summ J. at 18-19.) The Commissioner implies that given these deficiencies, an evaluation of obesity beyond what already appears in the narrative was not required. (*Id.* at 19.) In support of this claim, the Commissioner relies on *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662 (6th Cir. 2004).

In *Essary*, the Sixth Circuit considered the claimant's argument that the ALJ erroneously evaluated her RFC because "the ALJ failed to consider the impact of her obesity." *Id.* at 667. The Court – without referring to S.S.R. 02-1p – provided:

15

Essary next challenges the ALJ's assessment of her ability to work on the basis that the ALJ failed to consider the impact of her obesity. However, the ALJ did take Essary's obesity into account, stating in his decision that "degenerative disc disease of the lumbar spine, obesity, hypertension, and major depressive disorder, can reasonably be expected to result in some degree of functional physical and mental limitations . . . ." ALJ Decision at 5. The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity. *See Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting claimant's "argument that the ALJ erred in failing to consider his obesity in assessing his RFC," explaining that, "Although his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.").

*Essary*, 114 F. App'x at 667.[8]

The Court adds that in *Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852 (6th Cir. 2003), the Sixth Circuit rejected a claim that the ALJ erred in evaluating obesity using similar reasoning. In *Cranfield*, the claimant was 5' 4½" tall with a weight range of 214 to 276 pounds. *Id.* at 853. Further, at least one set of medical records frequently noted the claimant's obesity. *Id.* at 854. The claimant, however, "never claimed that her weight affected her ability to work." *Id.* at 853. In challenging her denial of benefits, the claimant asserted "that the ALJ should have specifically addressed her obesity when he determined her level of impairment." *Id.* at 857. The Sixth Circuit concluded that the ALJ's disability analysis was not in error:

[The ALJ] addressed all of the issues that Ms. Cranfield relied on in her claim for benefits – back, foot, hand, and leg problems. . . . The ALJ did nothing more than mention Ms. Cranfield's obesity because neither Ms. Cranfield nor her doctors offered any evidence to suggest that her weight was a significant impairment. Since Ms. Cranfield's claims did not indicate that obesity was a significant impairment, the

---

[8]*Forte v. Barnhart*, 377 F.3d 892 (8th Cir. 2004) also does not discuss S.S.R. 02-1p.

16

ALJ was not required to give the issue any more attention than he did. . . .

She [also] asserts that because her doctors' reports indicated her obesity, [under 20 C.F.R. § 404.1512] the ALJ was required to consider it as a possible impairment. The problem with this argument is the ALJ never received evidence suggesting Ms. Cranfield or her doctors regarded her weight as an impairment. In fact, Ms. Cranfield provided no evidence that obesity affected her ability to work. Moreover, 20 CFR § 404.1512(a) required Ms. Cranfield to "furnish medical and other evidence that [the SSA] can use to reach conclusions about [her] medical impairment(s) and . . . its effect on [her] ability to work on a sustained basis." See 20 CFR § 404.1512(a).

*Cranfield*, 79 F. App'x at 857.

But even in view of *Cranfield* and *Essary*, the Court remains troubled by the following combination of facts: (1) Plaintiff stood 5' 6" tall and weighed over 450 pounds for the two years prior to the administrative hearing, (2) Plaintiff explicitly told the ALJ at the hearing that she weighed 484 pounds, and (3) Plaintiff told the ALJ that her obesity is limiting. The Court is well aware that S.S.R. 02-1p reminds an ALJ not to "make assumptions about the severity or functional effects of obesity combined with other impairments." 2002 WL 34686281 at *6. But, according to our Court of Appeals, that S.S.R. also provides that an ALJ must "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat*, 349 F. App'x at 577. In view of the three facts just recited, it seems that the ALJ should have at least provided a limited discussion of claimant's obesity – even if it was to simply advise the claimant and the Court along the following lines: "Because the claimant has not identified specifically how her obesity limits her functionally, and because no 'assumptions' about obesity may be drawn under S.S.R. 02-1p, the undersigned concludes that the claimant's obesity does not affect the step three, four, or five analysis." Instead, the ALJ referenced Plaintiff's obesity only by way of summarizing

17

medical records (records that, incidentally, report a weight about 150 pounds below Plaintiff's weight at the hearing).[9]

Despite this Court's reservations, if the ALJ's analysis of Plaintiff's obesity were this Court's sole concern, remand may not be warranted. *See Smith v. Astrue*, 639 F. Supp. 2d 836, 846 (W.D. Mich. 2009) (declining to remand under S.S.R. 02-1p where ALJ did not find obesity a severe impairment but where claimant did not carry her "burden of marshaling competent medical opinion and evidence to show specifically how her obesity exacerbated her other impairments, or interacted with them, to render her incapable of all suitable work."). But, in this case, the Court is further compelled to remand because of an erroneous finding of fact that relates to Plaintiff's obesity.

In discounting Plaintiff's credibility, the ALJ stated: "[The claimant] has sought out and received extensive treatment, but *there is no documentation of sleep apnea*, the need for oxygen on a daily basis, or severe limitations due to asthma or depression." (Tr. 18 (emphasis added).) The emphasized language is not supported by substantial evidence. As the Court summarized at the outset, the record reflects that Plaintiff underwent a sleep study and was diagnosed with obstructive sleep apnea syndrome. She was prescribed a CPAP machine. Further, this machine, while

---

[9]*Cranfield* and *Essary* are not indistinguishable from this case. As an initial matter, neither of those cases discuss S.S.R. 02-1p. Second, Plaintiff's weight was, at times, double the weight of the obese claimant in *Cranfield*. Further, in *Cranfield*, the claimant "never claimed that her weight affected her ability to work." 79 F. App'x at 853. In contrast, Plaintiff testified at the hearing that her obesity limited her abilities. (Tr. 30.) Plaintiff's pre-hearing brief, while focusing on other issues, also provided that "morbid obesity" was a basis for disability. (Tr. 234, 238.) As for *Essary* – the Commissioner's principal case – the ALJ there at least stated that the claimant's impairments, including obesity, "can reasonably be expected to result in some degree of functional physical and mental limitations . . . ." *Essary*, 114 F. App'x at 667. In view of this statement the Court provided that "further elaboration" on the issue of obesity was not necessary. *Id.* In contrast to *Essary*, the ALJ in this case – despite testimony at the hearing that Plaintiff weighed 484 pounds – did not concede that Plaintiff's obesity could "reasonably be expected to result in some degree of functional physical and mental limitations."

significantly reducing the effects of Plaintiff's sleep apnea, did not eliminate them.

This factual error regarding Plaintiff's sleep apnea is significant in at least three respects. First, there are listings for respiratory system disorders including a specific listing for sleep-related breathing disorders. Listing 3.10, 20 C.F.R. Pt. 404, Subpt. P, App'x 1. And Listing 3.00.I provides that respiratory system disorders may be complicated by a claimant's obesity:

> Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App'x 1. The ALJ did not consider Listings 3.10 and 3.00.I at step three of the disability determination process. At least one Court has remanded where the ALJ *did* consider the claimant's sleep apnea at step three, but failed to consider how the claimant's sleep apnea was compounded by the claimant's obesity. *See Monda v. Astrue*, 1:09CV2618, 2011 WL 1344285, at *5 (Mar. 28, 2011) *report and recommendation adopted by* 2011 WL 1344286 (N.D. Ohio Apr. 8, 2011) ("Here, although the ALJ found the obesity to be severe, he merely listed it as an impairment without discussing whether it increased the severity of coexisting impairments. . . . While S.S.R. 02-1p does not prescribe a specific procedure for evaluation of obesity, it does make clear that sleep apnea is an effect of obesity and thus should be considered in analyzing the listings. . . . As the ALJ found obesity and sleep apnea to be severe impairments, he should have taken both into consideration when analyzing the listings."). This case arguably goes even one step further.

19

Second, the failure to credit Plaintiff's sleep apnea, and consider whether the fatigue associated with that condition is heightened by Plaintiff's obesity, may have led to an erroneous residual functional capacity ("RFC") determination.  In creating Plaintiff's mental RFC, the ALJ apparently relied on the RFC of a State Disability Determination Services ("DDS") physician. (*Compare* Tr. 484 *with* Tr. 17.)  But neither the ALJ nor the DDS physician were aware of Plaintiff's sleep apnea.  This is evidenced by the fact that Plaintiff's November 14, 2007 sleep study could not have been among the records the DDS physician reviewed that very day (*see* Tr. 468, 648), and by the fact that both the ALJ and the DDS physician only evaluated Plaintiff's mental impairments under listings corresponding to major depression or bipolar disorder (Listing 12.04) and borderline personality disorder (Listing 12.08).  (*See* Tr. 16, 468.)  Yet, based on just those two mental impairments, the ALJ limited Plaintiff to simple work involving basic one- and two-step instructions.  (*See* Tr. 17, 484.)  Had the ALJ considered Plaintiff's sleep apnea in combination with her obesity, her mental RFC, in particular her ability to concentrate or keep pace, may have been further restricted.  *See* S.S.R. 02-1p, 2002 WL 34686281, at *6 ("The effects of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  This can lead to drowsiness and lack of mental clarity during the day.  Obesity may also affect an individual's social functioning. . . .  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.  This may be particularly true in cases involving sleep apnea. . . . As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.").[10]

_____

[10]The Court adds that, despite Plaintiff's extreme obesity, the ALJ's RFC permits "occasional" stair or ramp climbing, and "occasional" balancing, stooping, crouching, kneeling, or crawling.  Under the regulations, "occasional" is up to one-third of an eight-hour workday.  *See*

Finally, and most directly, the ALJ's factual misstatement about Plaintiff's sleep apnea may have caused him to erroneously discount Plaintiff's credibility. In finding Plaintiff's testimony not entirely credible, the ALJ explained:

> The evidence shows the claimant engages in essentially typical daily activities. She is able to function and maintain a daily routine. She has not required long term hospitalization for any physical or mental difficulties. No surgical intervention or other aggressive treatments have been prescribed. Clinical and laboratory findings have been mostly negative and any abnormalities have been only mild or minimal. Diagnostic tests do not support a reason for her pain complaints. She obtains good, if not total, relief from prescribed medications when taken as instructed. The medical record contains no significant complaints of medication side effects or ineffectiveness that might reasonably prevent her from completing an eight-hour workday. *None of the treating or examining sources indicates any basis to find limitations in her daily activities or that daily napping and use of an amigo is a necessary or helpful measure for treating her impairments. The medical evidence simply does not support the level of symptomology alleged. She has sought out and received extensive treatment, but there is no documentation of sleep apnea, the need for oxygen on a daily basis, or severe limitations due to asthma or depression.* She has some treatment for back pain, but the objective findings indicate normal cervical spine, and there are no objective findings with regard to her lumbar spine.

(Tr. 18.) The emphasized language reflects that the ALJ did not credit Plaintiff's claim that she needs to nap, use a motorized scooter for transportation, or that she suffers from sleep apnea. The ALJ may have found this testimony credible, however, if he had considered Plaintiff's sleep apnea in combination with her obesity.

In sum, the ALJ's borderline non-compliance with S.S.R. 02-1p and the ALJ's erroneous finding of fact regarding Plaintiff's sleep apnea, taken together, warrant remanding this case for further explanation and/or fact finding. Because this Court recommends remand at step three,

---

S.S.R. 83-10, 1983 WL 31251 at *5; S.S.R. 96-9p, 1996 WL 374185, at *3.

Plaintiff's remaining arguments, which claim error in the ALJ's RFC and credibility assessments, and in the ALJ's weighing of evidence, are moot.

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ did not sufficiently evidence that he considered Plaintiff's obesity and failed to adequately address Plaintiff's sleep apnea. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment, which seeks a remand pursuant to sentence four of 42 U.S.C. § 405(g), be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that the decision of the Commissioner be REMANDED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: May 11, 2012


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 11, 2012.

s/Jane Johnson
Deputy Clerk